1 | ROBBINS GELLER RUDMAN
    & DOWD LLP
2 | SHAWN A. WILLIAMS (213113)
Post Montgomery Center
3 | One Montgomery Street, Suite 1800
San Francisco, CA 94104
4 | Telephone: 415/288-4545
shawnw@rgrdlaw.com
5 |
WITES & ROGERS, P.A.
6 | MARC A. WITES
(*pro hac vice* pending, Fla. Bar No. 24783)
7 | MICHELE M. DESOER (119667)
4400 North Federal Highway
8 | Lighthouse Point, FL 33064
Telephone: 954/933-4400
9 | mwites@witeslaw.com
mdesoer@witeslaw.com
10 |
Attorneys for Plaintiff
11 | PVC FENCE WHOLESALE, LLC
and the CLASS
12 |
[Additional counsel listed on signature block.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| PVC FENCE WHOLESALE, LLC, Individually and on Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>   vs.<br><br>GOOGLE LLC, a Delaware LLC,<br><br>               Defendant. | Case No.<br><br>CLASS ACTION<br><br>CLASS ACTION COMPLAINT<br><br><br><br>DEMAND FOR JURY TRIAL |

1  Plaintiff PVC Fence Wholesale, LLC, a Florida limited liability company ("Plaintiff"),

2  individually and on behalf of all those similarly situated ("Class" or "Class Members"), brings this

3  Class Action Complaint ("Complaint") against Defendant Google LLC ("Google" or "Defendant")

4  and alleges upon personal knowledge as to its own actions and investigation of counsel, and upon

5  information and belief as to all other matters, as follows:

### INTRODUCTION

7  1.    This lawsuit arises from Google's unlawful practice of charging its customers for

8  alleged advertising about which Google refuses to disclose any details other than the amount

9  charged. Google, through this unfair and deceptive practice, hides from its customers the data

10  necessary to determine if they are paying for the advertising the customers purchased, let alone if

11  they are receiving any resulting advertising benefit for the monies they pay to Google. Google's

12  advertising program, previously known as Google AdWords and recently rebranded as Google

13  Ads, purports to allow customers to pick the precise words and phrases – known as keywords –

14  that will cause a customer's ad to display in a Google search. This service, often referred to as pay-

15  per-click advertising, is essentially the only effective way for a business to advertise online as

16  Google, a monopoly, dominates the search engine market with a market share of over 90%.

17  2.    Google provides its customers with detailed reporting that displays what one would

18  think would be each and every keyword for which the customer agreed to pay, and Google charges

19  for every click. However, an average of 28%[1] or more of a customer's monthly charges – and for

20  the instant Plaintiff almost **38%** of their Ad Words Campaign charges – are categorized by Google

21  under the unclear and opaque moniker "other search terms" for which Plaintiff has no idea what it

22  paid for and Google does not – and refuses to – provide any details:

24  [CONTINUED ON NEXT PAGE]

---

26  [1]    Alex Turbett, et al., *Google Ads Removes Search Terms for 28% of Paid Search Budgets*, SEER
27  INTERACTIVE (Sept. 2, 2020), https://www.seerinteractive.com/insights/google-ads-removes-
search-terms-for-28-percent-of-paid-search-
28  budgets?utm_source=twitter.com&utm_medium=social&utm_campaign=google-search-term-
update.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| ☐ | lawyers who sue insurance companies near me | Exact match | ✓ Added | Hurricane Million Insurance Claim Lawyers | Insurance Claims | – | 60 | 8 clicks | 13.33% | $32.05 | $256.40 | Search | 12.50% | 1.00 |
| ☐ | insurance attorneys near me | | | Hurricane Million Insurance Claim | Insurance Claims | – | 57 | 8 clicks | 14.04% | $30.67 | $245.34 | Search | 12.50% | 1.00 |
| | Total Search terms ⓘ | | | | | – | 10,639 | 910 clicks | 8.55% | $33.17 | $30,180.19 | | 26.21% | 238.50 |
| | Total Other search terms ⓘ | | | | | – | – | – | – | – | $73,012.55 | | | $27.50 |
| | Total: Account | | | | | – | 29,967 | 3,568 clicks | 8.95% | $28.92 | $103,192.74 | | 21.47% | 766.00 |

In other words, Google charges the customer for alleged clicks on keywords that Google refuses to disclose and for which the customer is unable to tell what it paid for, if it received any click-through advertising at all. Click here to watch videos[2] explaining how Google's "other search term" program works with visuals of an actual Google Ad Words account:



Hidden Search Terms in Google Ads - What Google Ads Isn't Telling You

https://www.youtube.com/watch?v=javAUeaciJY



"Other Search Terms" In AdWords: Your Hidden Traffic Data

https://www.youtube.com/watch?v=6mM9fXdT2aU

3.      Between 2007 and 2020, Google disclosed the search terms for all the ads for which it charged customers. *United States v. Google LLC*, 747 F. Supp. 3d 1, 84 (D.D.C. 2024) ("*Google Antitrust Decision*") ("Prior to 2020, SQRs included all queries that resulted in an ad click, even if there was only a single click (*i.e.*, the 'one-click threshold')").[3] It only switched to using a broad category of "other search terms" in 2020 based on grounds of purported privacy concerns, a claim

---

[2]    Click on the videos or the links to watch.

[3]    Unless otherwise noted, all emphasis is added and citations are omitted.

that was refuted in evidence introduced in the trial leading up to the *Google Antitrust Decision*. *See* ¶¶62-63, *infra*.[4]

4.     Charging a customer for a secret or unknown good or service that the customer never agreed to purchase, and about which the seller refuses to provide any disclosure, is a quintessential breach of contract, unfair dealing, and unfair and deceptive trade practice. Not surprisingly, Google Ad Word users are calling bunk:[5]



4     But see paragraph 53 and n. 16 *infra* (containing video which suggests that Google has been hiding data concerning clicks and impressions through its "other search terms" scheme since 2017 or earlier).

5     Google Ads Help, *Other Search Terms Fake or Real?* (Aug. 11, 2023), https://support.google.com/google-ads/thread/229803364/other-search-terms-fake-or-real?hl=en. Not surprisingly, Google locks down such posts and disables replies on its Google Ads Help pages.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL – Case No.                    - 3

Google brazenly engages in such conduct because it knows, by virtue of its monopoly power, that customers have no other effective way to advertise online,[6] and by billing customers for services Google may not provide and does not disclose, Google overcharges customers with impunity.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction pursuant to 28 U.S.C. §1332(d)(2)(A) because at least one member of the Class is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

6.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

7.     This Court has personal jurisdiction over Defendant because Defendant is a citizen of California; Defendant has registered to, and does in fact, conduct substantial business throughout California, including in this District; and Defendant has its headquarters in California, which is its principal place of business.

8.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because Defendant: (a) is authorized to conduct business in this District; (b) has intentionally availed itself of the laws and the markets in this District; (c) conducts substantial business in this District; and (d) is subject to personal jurisdiction in this District.

## DIVISIONAL ASSIGNMENT

9.     This Division is proper pursuant to L.R. 3-2(c) and 3-5(b) as Google is headquartered in Mountain View, California and a significant amount of the conduct at issue took place and had an effect in Mountain View.

---

[6]    *See United States v. Google LLC*, 2025 WL 1132012, at *31 (E.D. Va. Apr. 17, 2025) (finding after three-week trial that "[p]laintiffs have proven that Google possesses monopoly power in the ad exchange for open-web display advertising market").

**PARTIES**

10.     Plaintiff PVC Fence Wholesale, LLC is a Florida limited liability company, is a citizen of Florida, and has its principal place of business in Broward County, Florida. At all times material hereto, Plaintiff used Google Ads to advertise and market its products and services.

11.     Defendant Google LLC is a Delaware limited liability company with its principal place of business in Mountain View, California and is a wholly owned subsidiary of Alphabet Inc.

12.     Plaintiff has suffered actual injury and is continuing to suffer actual injury because Plaintiff continues to advertise using Google Ads due to Defendant's monopoly in the area of online click advertising (*see, infra* at ¶76), and Defendant continues to charge Plaintiff for advertisements placed for which it refuses to provide detail that would allow Plaintiff to maximize the efficacy of its advertising spend.

**GENERAL ALLEGATIONS**

13.     Google is one of the largest corporations in the world. Its business focuses on, among other things, artificial intelligence, internet search engine technology, online or digital advertising, cloud computing, computer software, quantum computing, e-commerce, and consumer electronics.

14.     Google has been referred to as the "most powerful company in the world" and one of the world's most valuable brands due to its market dominance, data collection, and technological advantages in the area of artificial intelligence.

15.     Among other things, Google offers the public a "general search engine" ("GSE") that is used on nearly 90% of all internet searches.[7] This number reaches nearly 95% on mobile devices. *Google Antitrust Decision*, 747 F. Supp. 3d at 31; *see also id.* at 38 (¶¶23-24).

16.     "The general search engine has revolutionized how we live. Information that once took hours or days to acquire can now be found in an instant on the internet with the help of a general search engine. General search engines use powerful algorithms to create what seems like

---

[7]   Naveen Kumar, *82 Google Ads Statistics 2025 – Market Share & Ads Revenue*, DEMANDSAGE (Jan. 31, 2025), https://www.demandsage.com/google-ads-statistics/; https://gs.statcounter.com/search-engine-market-share.

1    magic. Enter a search query, and the general search engine will retrieve, rank, and display the

2    websites that provide the exact information the user seeks at that very moment." *Id.* at 31.

3        17.    "Google is widely recognized as the best GSE available in the United States." *Id.*

4    at 56.

5        18.    In fact, the term "Google" has become a near-generic term for "internet search." *Id.*

6    at 31 ("The brand is synonymous with search."); *see also id.* at 57 ("Perhaps the best example of

7    Google's brand is that the public uses the term 'Google' interchangeably with internet search. [T]o

8    search is to Google. Google is a verb.") (cleaned up).

9        19.    General search engines allow for various types of queries that can, generally, be

10   categorized as commercial and non-commercial.

11       20.    A non-commercial query might be, for example, a search for the history of the

12   Vikings or a recipe for gazpacho.

13       21.    Commercial queries are those whereby a potential customer searches for products

14   and services and Google, through its GSE, provides a listing of businesses that provide goods that

15   are consistent with what the customer seeks on the resulting "Search Engine Results Page" or

16   "SERP."

17       22.    "Paid advertisements are typically generated in response to a commercial query and

18   usually appear at the top of a SERP." *Id.* at 41.

19       23.    Google allows businesses to purchase a right of placement as a paid advertisement

20   on SERPs in response to potential customer searches through its Google Ads system.

21       24.    As explained by the District Court in the *Google Antitrust Decision*:

22       ***General search engines make money by selling digital advertisements***. Type the
         words "running shoes" into a general search engine, and sellers of running shoes
23       will compete with one another in a split-second auction to place an advertisement
         on the results page, which if clicked takes the user directly to the seller's website.
24       This is a highly effective way of reaching consumers. It is also an incredibly
         lucrative business. In 2021, advertisers spent more than $150 billion to reach users
25       of general search engines.

26   *Id.* at 31.

27       25.    Rather than allowing businesses to purchase direct placement advertising on a

28   Google SERP, Google Ad users "bid" on advertising placement in response to customer searches.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL – Case No.                    - 6 -

26.    Exhibit A attached hereto is a copy of the Google Ads Advertising Program Terms ("Advertising Program Terms") which is the sole document that governs the relationship between Plaintiff and Defendant.

27.    In fact, it is non-negotiable and governs the relationship between all members of the Class and Defendant.

28.    Notably, this document does not contain a payment schedule or any discussion concerning how Google Ads users such as Plaintiff are charged by Defendant.

29.    The document also contains scant commitments or obligations by Defendant in connection with its role as the operator of the Google Ads program including how Google Ads function, how Defendant places users' ads in response to internet searches, how Defendant "auctions" placements between different businesses, or how it determines the amount it charges a user for each advertisement placement.

30.    Accordingly, advertisers like Plaintiff necessarily rely on the information that Defendant provides in its online materials to provide these missing terms of the parties' contracts.

**How Google Ads Function: Defendant Places Ads on SERPS**

**Based On Users' Search Parameters.**

31.    Google claims that Google Ads allows advertisers to:[8]

[CONTINUED ON NEXT PAGE]

---

[8]    Screenshot from https://tinyurl.com/mpdj7r8c (last visited June 26, 2026).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL – Case No.                - 7 -

## Achieve all your goals in one place

**Maximize leads and conversions**

Get better quality leads and enhance conversions.

**Increase online sales**

Show up where shoppers are and increase site traffic and sales.

**Drive in-store foot traffic**

Bring people through your doors and increase offline sales.

**Show your brand to more people**

Put your brand out there to increase reach and engagement.

**Market your app to new users**

Put your app in front of the right users to drive downloads and engagement.

32.  Businesses that use Google Ads identify specific search parameters on which they wish to bid by identifying search terms and then specifying how close to the search terms a potential customer enters for it to want to bid on the ads.

33.  When selecting search terms that a company wishes to bid on, for each term or set of terms, the company specifies how close a match it will accept in order to bid on the search term.

34.  Specifically, there are only three parameters from which a Google Ads user can select that provide more or less specificity for the matching of key terms, which are known as broad match, phrase match, and exact match, and are explained by Google as follows:[9]

### About keyword matching options

Keywords are words or phrases that are used to match ads with the terms people are searching for. The keyword match types dictate how closely the keyword needs to match with the user's search query so that the ad can be considered for the auction. For example, you could use broad match to serve your ad on a wider variety of user searches or you could use exact match to hone in on specific user searches.

---

[9]  Google Ads Help, *About keyword matching options*, https://support.google.com/google-ads/answer/7478529?hl=en#zippy=%2Cbroad-match%2Cphrase-match%2Cexact-match    (last visited June 13, 2025).

## Keyword match types



35. Google defines these terms as follows:[10]

Broad Match: Ads may show on searches that are related to your keyword, which can include searches that don't contain the direct meaning of your keywords. This helps you attract more visitors to your website, spend less time building keyword lists, and focus your spending on keywords that work. Broad match is the default match type that all your keywords are assigned because it is the most comprehensive. That means you don't have to specify another match type (like exact match or phrase match).

Phrase Match: Ads may show on searches that include the meaning of your keyword. The meaning of the keyword can be implied, and user searches can be a more specific form of the meaning. With phrase match, you can reach more searches than with exact match and fewer searches than with broad match, only showing your ads on the searches that include your product or service.

Exact: Ads may show on searches that have the same meaning or same intent as the keyword. Of the 3 keyword matching options, exact match gives you the most steering over who views your ad, but reaches fewer searches than both phrase and broad match.

36. On the flip side, Google allows the customer to select "negative keywords[,]" which means keywords for which Google will not presumably place the ads and charge the customer:

---

[10]  *Id.*

You can use negative keywords to exclude your ads from showing on searches with that term. For example, if you're a hat company that doesn't sell baseball hats, you could add a negative keyword for baseball hats.[11]

37.    Broad Match, Phrase Match, and Exact Match are the only options. There is no option for secret, unknown, or undisclosed keywords, matches, or phrases of any kind. And, of course, Google never discloses that it is going to charge for keywords that it will not disclose or that the customer did not select.

38.    Google further explains this process as follows:[12]

## How it works

The search terms report is a list of search terms that a significant number of people have used, and that resulted in your ad being shown. Depending on your keyword matching options, the search terms listed might be different from your keyword list.

The "Match type" column tells you how closely the search terms that triggered your ads on Google are related to the actual keywords in your account. By checking which match types are working well for which keywords and searches, you can refine match types for all your keywords so that only the right searches cause your ad to show. The "Keyword" column tells you which of your keywords matched someone's search term and triggered your ad. This column doesn't show by default. To learn how to modify columns, refer to View your search terms report.

## How search term match type is determined

To help you understand how the search term match type is determined, we'll use the following example:

| Ad group | Keyword |
|---|---|
| Ad group A | Exact match keyword **[purple flowers]** |
| Ad group B | Phrase match keyword **"purple flowers"** |
| Ad group C | Broad match keyword **purple flowers** |

39.    Google then provides examples on how these different search options would match up with customer searches:[13]

---

[11]    *Id.*

[12]    Google Ads Help, *About the search terms report*, https://support.google.com/google-ads/answer/2472708?hl=en#zippy=%2Cunderstanding-the-keyword-column%2Cunderstanding-the-match-type-column (last visited June 13, 2025).

[13]    *Id.*

Keeping these ad groups and keywords in mind, we'll use the following table to show you how different search terms that triggered your ads on Google are related to your keywords. Note that when the search term match type is a close variation it will be indicated in the "Match type" column. Close variants can include misspellings, singular and plural forms, acronyms, stem words (such as floor and flooring), abbreviations, accents, and variants of your keyword terms that have the same meaning.

Keep in mind that a search term match type listed in your report might not be the same as the match type you've selected for the keyword that triggered the ads. This is because keywords with broader match types can still match search terms in narrower ways. For example, if someone searched for purple flowers, and your broad match keyword **purple flowers** triggered your ad, the search terms match type would be an exact match, even though in your ad group, **purple flowers** is a broad match keyword.

| Your keyword | Customer's search term | Search term match type | Reason for search term match type |
|---|---|---|---|
| [purple flowers] | purple flowers | Exact match | The search term exactly matches your exact match keyword from ad group A. |
| [purple flowers] | purple flowrs | Exact match (close variant) | The search term is a close variant (same meaning and intent) of your exact match keyword from ad group A. |
| "purple flowers" | purple flowers | Exact match | The search term exactly matches your phrase match keyword from ad group B. |
| "purple flowers" | free purple flowers | Phrase match | The search term contains your phrase match keyword from ad group B. |
| "purple flowers" | free purple flowrs | Phrase match (close variant) | The search term is a close variant (same meaning and intent) of your phrase match keyword from ad group B. |
| purple flowers | purple flowers | Exact match | The search term exactly matches your broad match keyword from ad group C. |
| purple flowers | free purple flowers | Phrase match | The search term contains your broad match keyword from ad group C. |
| purple flowers | pink flowers | Broad match | The search term is a variation of your broad match keyword from ad group C. |

40.     With regard to negative keywords, in the example in the above screenshot, if the business does not want to bid on any searches that include the word "free" they can identify the word "free" as a "negative keyword."

41.     Google provides the following as another example:[14]

---

[14]  *Id.*

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL – Case No.                    - 11

- If a search term isn't relevant enough to the products or services you offer, add it as a negative keyword. By adding irrelevant search terms as negative keywords, you can prevent your ad from showing to people who are looking for something you don't sell. For example, if you sell eyeglasses, and you noticed that the search term "wine glasses" is triggering your ads, you might want to add "wine" as a negative keyword.

**The Search Query Reports Google Provides To Its Advertiser-Customers**

42.     Since 2007, Google Ads has provided advertisers access to Search Query Reports ("SQRs") that identify the search parameters bid on that resulted in their ads being shown to potential customers and along with the "conversion rate," which is the number of times that a user clicked through to the advertiser's website after being shown the company's advertisement in response to their search; as a result, advertisers can assess which search terms are driving customers to their website and, if necessary, modify their campaign accordingly.

43.     In order for an advertiser to assess how well its search terms are working to find potential customers, the advertiser can access its Google Ads account to view its SQR.

44.     Google acknowledges that advertisers use the SQRs "in order to measure their advertiser effectiveness, or they could use it in order to improve the range of keywords that they use in order to be able to target users that are looking for their products or services." *Google Antitrust Decision*, 747 F. Supp. 3d at 84; *see also id.* ("Google was aware that SQRs were widely used by advertisers of all segments" in order "in order to improve the range of keywords that they use in order to be able to target users that are looking for their products or services") (cleaned up).

45.     Google explains how this data is used to improve the advertiser's decision to prioritize search terms:[15]

[CONTINUED ON NEXT PAGE]

---
[15] *Id.*

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL – Case No.

## Understanding your search terms data

**Understanding the "Keyword" column**    ⌄

The "Keyword" column tells you which one of your keywords matched someone's search term and triggered your ad. This information can help you check your keywords "in action" by showing you how they're matching to actual searches.

You can use the data in the "Keyword" column to improve your keyword list. For example, let's say you sell tulips. When you look at your search terms report, you'll notice that your broad match keyword flowers triggers your ad to show when customers search for red roses and purple orchids—flowers you don't sell. So, you decide to refine your keyword list to focus on terms and phrases more specific to the products you do offer: tulips.

The "Keyword" column doesn't show by default. In the new Google Ads experience, to turn on the "Keyword" column, click the column icon ▊▊▊ , then click "Attributes". Check the box beside "Keyword", then click "Apply".

**Understanding the "Match type" column**    ⌄

The "Match type" column in your search terms report tells you how closely the search terms that triggered your ads on Google are related to the actual keywords in your account. By checking which match types are working well for which keywords and searches, you can refine match types for all your keywords to better hone in on the right customers.

46.     Each time an ad is shown on SERPs in response to an internet search and the user clicks on the ad, Google charges the advertiser for placing its ad in response to the user search. That is, the advertiser pays per click.

47.     The more responsive an ad is to a search, the more likely a user is to click on the ad and reach the advertiser's website and, in turn, the more likely the user is likely to turn into an actual customer. A user who clicks on an ad is known as a conversion.

48.     The data provided in the SQRs is, therefore, essential for the advertisers as it informs the advertisers which search terms triggered the placement of their advertisements and whether placement in response to those triggering searches resulted in a user clicking through their ad onto the company's website.

49.     As a result, the detail in the SQRs is a critical tool for companies to maximize their ad buys and not waste money by bidding on terms that result in its advertisement being displayed in response to irrelevant queries.

50.    In practice, advertisers analyze these reports to determine which of its search terms and parameters are working, which are not, and ascertain whether there are "negative keywords" they should exclude; for example, in the example above concerning the eyeglass seller, the seller could determine that "wine" should be excluded from responsive searches.

51.    As explained in the *Google Antitrust Decision*, "Advertisers not only identify the keywords that may trigger participation in an auction, they also can identify so-called 'negative keywords,' which are keywords that an advertiser selects so as to avoid entry into an auction." 747 F. Supp. 3d at 85.

52.    However, following changes Google made to Google Ads in 2020, the actual SQRs provide nowhere near the detail that Defendant claims *and had previously provided*. Instead, each report contains a broad line-item for "other search terms" which triggered the posting of a company's ad, and for which Google charged the company.

53.    Regarding these "other search terms":

- Defendant refuses to provide advertisers with *any* information that would lead the company to know which search terms triggered, or ostensibly triggered, the placement of their ad.

- Advertisers cannot identify which search terms and parameters led to placement of advertisements in response to irrelevant queries that resulted in no clicks or conversions.

- Conversely, when a term or combination of terms lumped in "other search terms" *does* result in clicks and conversions, an advertiser has no data that would assist it to add these terms to their designated search terms and expand the scope of their search terms to include them.

- Because Defendant refuses to provide *any* detail that suggests which searches are triggering the advertisements, advertisers cannot refine their

search terms, the scope of their search terms, or add triggering, but unhelpful, words to their "negative search terms."

• Advertisers have no way to determine whether those hidden ad placements were in response to queries that do not fall within its selected and contracted-for search terms or parameters.

54. The percentage of ads generated by "other search terms" is not *de minimis*, but often includes 30-50% of the total ads for which Google charged a company; indeed, as shown in this video, *Other Search Terms in AdWords: Your Hidden Traffic Data*, that user had nearly 80% of the ads Google charged him for listed under "other search terms":[16]



55. Google made this switch "notwithstanding substantial projected data loss for advertisers and knowing that specific major advertisers, like Expedia and Booking.com, had stated they would be harmed." *Google Antitrust Decision*, 747 F. Supp. 3d at 84 (cleaned up).

56. "The less fulsome SQRs negatively impacted advertisers, who already have limited insight into how Google's auctions work." *Id.* at 85.

---

[16]  Search Scientists, *Other Search Terms In AdWords: Your Hidden Traffic Data* (May 11, 2017), https://www.youtube.com/watch?v=6mM9fXdT2aU ("Search Scientists Video").

57.    It also made it much more difficult for advertisers to identify negative keywords because of the reduced access to data in the SQRs. *Id.* at 87 ("negative keywords is a far more cumbersome way for advertisers to avoid undesirable auctions, ***a challenge made even more difficult with less information from SQR reports***").

58.    Furthermore, "Google did not inform advertisers how the threshold [for disclosing search terms] had changed." *Id.* at 85.

### The Importance to Google of Its Ad Words Text Advertising

59.    Ads placed through Google Ads are Google's nomenclature for its pay-per-click text advertising.

60.    "Text ads are . . . the predominant form of advertising on Google, whether measured by revenue or number of advertisers. In 2020, text ads made up about 80% of Google's search ads by revenue." *Id.* at 65.

61.    In fact, in 2023, Google Ads resulted in revenue to Defendant of over $237,000,000,000.[17]

62.    Moreover, "The vast majority of [Google's parent] Alphabet's revenues (nearly 80%) come from digital advertisements, and historically the largest component has been ads displayed on Google's search engine results page." *Google Antitrust Decision*, 747 F. Supp. 3d at 35.

63.    As a result, Defendant makes a huge amount of money from posting advertisers' text ads in response to hidden terms, but Defendant refuses to provide transparency to advertisers that would allow them to reduce waste of their advertising dollars and maximize the revenue generated by its marketing expenses.

64.    Indeed, Defendant does not even provide sufficient transparency to permit users of Google Ads to determine if those placements even ***arguably*** fall within the search parameters that the users established; those placements are black holes that trigger payments to Defendant from

---

[17]    *E.g.*, https://tinyurl.com/Google-2023-Ads-Revenue.

advertisers, but these advertisers have **no** ability to determine whether those charges were even possibly legitimate.

65.    A witness in the trial that led up to the *Google Antitrust Decision* testified that "they were buying certain queries but they were not being told which queries they're buying, as if you purchased a product in a supermarket but they don't tell you what you actually bought." *Id.* at 85 (cleaned up).

**Defendant's Asserted Justifications
for Not Providing the Necessary Detail Are Specious**

66.    Defendant asserts that the search terms are not provided for one of two reasons, neither of which is valid nor justifiable.

67.    First, Defendant asserts that grouped within the "other search terms" there are not sufficient identical terms for the detail to be provided; in other words, only one or a small handful of internet searches with those specific search terms triggered the ad's placement.

68.    Specifically, in 2020, Defendant announced that it would only include in the SQRs "terms that a significant number of users searched for, even if a term received a click"; in other words, even if the search had resulted in a conversion, Defendant would not inform users which term(s) had resulted in a conversion unless Defendant, in its own discretion, concluded that "a significant number of users" had searched that term.



*See* Surfside PPC, *Google Ads Will Limit Data in Search Terms Report – What It Means, Why It's Happening, & My Thoughts* (Sept. 2, 2020), https://www.youtube.com/watch?v=UVohteY_B10.

69.    This is false because Defendant regularly informs businesses when a search term was triggered on just one occasion (*see, e.g.*, Search Scientist Video, *supra* (showing many search terms reported that had only one impression)) and is obvious even from a posting on Defendant's own website:



Aftab Khan, *I Got Clicks and charged in other Search Terms but not getting details of any click or keyword*, Google Ads Help (Nov. 22, 2022), https://support.google.com/google-ads/thread/189643326/i-got-clicks-and-charged-in-other-search-terms-but-not-getting-details-of-any-click-or-keyword?hl=en (showing specific search terms that resulted in one or even zero impressions).

70.    Prior to September 2020, Defendant provided detailed reports that provided this data which, in turn, informed Google Ad Words users how to refine the scope of their search terms and/or add negative search terms which would result in their advertising budget being wasted in response to non-relevant searches. *See* ¶67, *supra* (Surfside PPC video).

71.    This data also allowed advertisers to determine if Google Ads was placing its text ads in response to queries that did not fall within its search terms or parameters; the current absence of data makes this task impossible.

72.    Second, Defendant asserts that the search terms are not disclosed for so-called "privacy" reasons. *See Google Antitrust Decision*, 747 F. Supp. 3d at 84 ("Ostensibly out of privacy concerns, [in 2020] Google removed the one-click threshold."). As explained by a Google Ads Liaison in a post on X/Twitter in response to a Google Ad Words user for whom Google allocated 50% of the user's charges to undisclosed "other search terms", Google stands behind a charade of privacy concerns:

[CONTINUED ON NEXT PAGE]



Victoria Spall, *Google Ads 'Other' Search Term Data, and What to Do About It*, BROWSER MEDIA

(Feb. 26, 2024), https://browsermedia.agency/blog/google-ads-other-search-term-data-and-what-

to-do-about-it/.

73.    This justification likewise does not explain the overwhelming number of "other

search terms" and can easily be addressed by redacting information that ***might*** appear in a search.

It is inconceivable that private information appears in the approximately 33.33% percent of

searches that trigger ad placement which Google deceptively classifies as "other search terms."

74.    Specifically, Defendant can easily provide the data without disclosing the IP

address that made the search, preserving any privacy concerns.

75. In fact, in the Department of Justice's antitrust lawsuit against Google, the court noted that "Google's own records show that the privacy rationale was suspect." *Google Antitrust Decision*, 747 F. Supp. 3d at 84.

76. Google's internal emails suggested that they "could [just] turn[]" the other search terms issue into a "[privacy-focused thing] without a lot of thought[,]" "queries are not PII,[18] even if I am the only person ever to search for your SSN[,]" and "queries aren't PII[.]" *Google Antitrust Decision*, 747 F. Supp. 3d at 84.

### Google Has a Monopoly in the General Search Text Ads Market

77. The fact is that Defendant has a monopoly in the general search text Ads Market as over 90% of searches use its search engine. *See* ¶1, *supra*; *Google Antitrust Decision*, 747 F. Supp. 3d at 136-38 (legal analysis leading to the court's conclusion that Google has monopoly power in the general search text ad market); *see also id*. at 137 ("text ads are unique to GSE SERPs" and the court already concluded that Google has a monopoly in GSEs).

78. Specifically, the District Court's decision in the *Google Antitrust Decision* held,

> that (1) ***there are relevant product markets for* general search services and *general search text ads***; (2) *Google **has monopoly power in those markets***; (3) Google's distribution agreements are exclusive and have anticompetitive effects; and (4) ***Google has not offered valid procompetitive justifications for those agreements***. Importantly, the court also finds that ***Google has exercised its monopoly power by charging supracompetitive prices for general search text ads***. ***That conduct has allowed Google to earn monopoly profits***.

*Id.* at 32-33.[19]

79. In fact, the court concluded that one of the two ways in which Google has used its monopoly for anticompetitive purposes is shown through the fact that "***advertisers receive less***

---

[18]  PII is personally identifiable information. A more precise definition is available at U.S, Department of Labor, *Guidance on the Protection of Personally Identifiable Information (PII)*, https://www.dol.gov/general/ppii (last visited June 13, 2025).

[19]  The court explained how, *inter alia*, Google's exclusivity agreements that require its placement on devices and in programs as the default search engine combined with the overwhelming costs to develop a competitive search engine have preserved Google's anticompetitive monopoly in violation of Section 2 of the Sherman Act. *Id.*, *passim*.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL – Case No.                    - 21 -

*information in search query reports (SQRs)*[,]" the issue addressed by this Complaint. *Id.* at 180 (also observing that "Google [is] a monopolist unconcerned about product changes that have decreased advertisers' autonomy over the auctions they enter and the ads they purchase. Google has suffered no consequences because it does not operate in a competitive text ads market.").

80.    As confirmed by this decision, advertisers have no realistic option to avoid Google Ads for advertising their products in response to internet searchers: they must use Google Ads or they cannot compete effectively.

81.    In fact, the next most-used search engine, Bing, had a 3.88% market share of the leading search engines as of April 2025. Statcounter, *Search Engine Market Share Worldwide, May 2024 – May 2025*, https://gs.statcounter.com/search-engine-market-share#:~:text=Search%20Engine%20Market%20Share%20Worldwide,Search%20Engine%20(D eskt.



82.    Because of Defendant's overwhelming dominance in online text advertising in response to commercial search engine queries, and because most potential retailers and consumers rely on Google as their search engine, companies wishing to advertise their products or services have no option other than to use Google Ads to place their advertising in response to user internet searches. *See Google Antitrust Decision*, 747 F. Supp. 3d at 76.

83.    Defendant uses its monopoly and anticompetitive methods to, among other things, hamstring companies' efforts to maximize the value of their advertising budget by refusing to disclose the "other search terms" that caused their ads to be placed, while Defendant retains the profit derived from those advertising dollars.

84.     Yet, Defendant knows that it need not accede to businesses' requests for detail because Defendant's monopoly guarantees that businesses will necessarily continue using Google Ads because they have no viable alternative.

85.     As a result, users such as Plaintiff are paying a significant portion of their advertising budget to Defendant with absolutely: (a) no means to ascertain if those charges were legitimate, *i.e.*, consistent with their established search parameters; and (b) no ability to refine their searches to either add productive search terms or designate negative search terms.

86.     Google, all the while, generates huge revenue. By categorizing approximately one-third of the terms for which it charges users for clicks as opaque "other search terms," effectively overcharging users for the search terms it does not disclose, knowing that advertisers have no choice but to pay Google for advertising because they have no place else to go.

87.     Moreover, in addition to deceiving and overcharging its customers, Google also makes it extremely difficult to bring lawsuits like the instant case by including in its Advertising Program Terms an arbitration mandate, one-sided damages limitations, and anti-class action provision.

**The Damages Limitation in Google's Advertising Program Terms Is Unenforceable**

88.     Any attempt by Google to limit Plaintiff's damages under its Advertising Program Terms will fail.

89.     Paragraph 10 of the Advertising Program Terms (Exhibit A) (the purported "Damages Limitation") purports to limit Plaintiff's recovery on any claims against Defendant by stating that Google:

> WILL NOT BE HELD LIABLE FOR DAMAGES UNDER THESE TERMS OR ARISING OUT OF OR RELATED TO PERFORMANCE OF THESE TERMS FOR ANY GIVEN EVENT OR SERIES OF CONNECTED EVENTS IN THE AGGREGATE OF MORE THAN THE AMOUNT PAYABLE TO GOOGLE BY CUSTOMER UNDER THE TERMS IN THE THIRTY DAYS BEFORE THE DATE OF THE ACTIVITY FIRST GIVING RISE TO THE CLAIM.

90.     This purported Damages Limitation is unenforceable because it is both procedurally and substantively unconscionable vis-à-vis Plaintiff and the Class.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL – Case No.                                   - 23

91.    The Damages Limitation is procedurally unconscionable because: (a) it is a contract of adhesion; and (b) Plaintiff has no commercially viable alternative to place its advertising in response to internet searches other than to place advertisements with Google Ads. *See, e.g.*, *Iravanian v. Translations.com, Inc.*, 687 F. Supp. 3d 871, 877 (N.D. Cal. 2023) (in the context of procedural unconscionability, "[o]ppression occurs where a contract involves **lack of negotiation and meaningful choice**").[20]

92.    Defendant does not negotiate the terms of the Advertising Program Terms, and Plaintiff, and other businesses, have no other viable market for placing ads in response to search engine searches. *Cf. Gatton v. T-Mobile USA, Inc.*, 152 Cal. App. 4th 571, 585 (2007) ("courts are not obligated to enforce highly unfair provisions that undermine important public policies simply because there is some degree of consumer choice in the market"); *see also Google Antitrust Decision*, 747 F. Supp. 3d at 76. There is no consumer choice in the market.

93.    The Damages Limitation is also substantively unconscionable because the only exceptions to its terms are ones that benefit Defendant; the exceptions are only for: (a) **indemnification by Plaintiff** for claims made against Defendant by third parties and for claims by Defendant against Plaintiff for "use or breach" by Plaintiff; (b) **breaches by Plaintiff**, regardless of fault, if it provides "Ads that contain or connect to malware, spyware, unwanted software or any other malicious code, or knowingly breach or circumvent any Program security measure"; (c) **Plaintiff's breach of its obligation** to "not make any public statement regarding the relationship contemplated by these Terms (except when required by law)"; and (d) **Plaintiff's "disclos[ure] of any information from Beta Features or the terms or existence of any non-public Beta Features**." Exh. A, ¶10. *See, e.g.*, *Nelson v. Dual Diagnosis Treatment Ctr., Inc.*, 77 Cal. App. 5th 643, 662 (2022) ("Drastic limitations on one party's remedies support a finding of substantive unconscionability."); *Lhotka v. Geographic Expeditions, Inc.*, 181 Cal. App. 4th 816, 825 (2010) (damages limitation is unconscionable when it guarantees that a plaintiff "could not possibly obtain

---

[20]    The contract provides that "ALL CLAIMS ARISING OUT OF OR RELATING TO THESE TERMS OR THE PROGRAMS WILL BE GOVERNED BY CALIFORNIA LAW." Exh. A. at 14(a) (capitalization in original).

1    anything approaching full recompense for their harm by limiting any recovery they could obtain

2    to the amount they paid . . . for their trip"); *see also Ramirez v. Charter Commcn's, Inc.*, 16 Cal.

3    5th 478, 498 (2024) (finding substantive unconscionability in arbitration agreement where

4    "[g]uidelines make clear, a wide range of statutory and policy-based claims that would typically

5    be initiated by an employee are directed into arbitration. On the other hand, only a small subset of

6    claims that would typically be initiated by Charter are similarly directed.").

7    94.    There are no exceptions for ***any*** types of claims brought by Plaintiff under any

8    circumstances.

9    95.    In addition, the Damages Limitation is unenforceable pursuant to California Civil

10    Code §1668 to the extent it purports to exempt Defendant "from responsibility for [its] own fraud,

11    or willful injury to the person or property of another, or violation of law, whether willful or

12    negligent[.]"

13    96.    Furthermore, to the extent that the Damages Limitation results in an effective

14    waiver of statutorily available damages as discussed below, that provision is also unenforceable.

15    *See, e.g.*, *MacClelland v. Cellco P'ship*, 609 F. Supp. 3d 1024, 1037 (N.D. Cal. 2022) ("California

16    courts have found substantive unconscionability where an arbitration clause limits the types of

17    remedies that would be available under the statute, thus violating the principle that an arbitration

18    agreement may not limit statutorily imposed remedies such as punitive damages and attorney

19    fees.") (cleaned up).

20    97.    Finally, even if it were not unenforceable for the reasons discussed above, the

21    Damages Limitation also is invalid to the extent it is deemed to be liquidated damages because it

22    was unreasonable under the circumstances at the time the contract was made.

23    98.    Specifically, Defendant can simply cancel a user's access to Google Ads if the user,

24    such as Plaintiff, fails to pay for its services, thus minimizing its damages to approximately one

25    month's service costs; furthermore, Defendant's contract affords it several exceptions under which

26    Defendant, and Defendant alone, is not restricted from seeking greater damages.

27    99.    However, Plaintiff has no such assurances, particularly under circumstances where

28    it may not discover its claims reaching back in time.

100.    As discussed by the court in the *Google Antitrust Decision*, Google is not transparent with advertisers when it enacts new policies (*e.g.*, the one at issue here) and surreptitious price increases that are never disclosed to advertisers.

101.    As a result, the Damages Limitation penalizes users by capping their damages because the amount of their damages bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from Google's actions both contractual and non-contractual.

102.    It would be self-evident to the contract's drafter that the fees paid by a user to Defendant in the prior month would, under most circumstances, not properly compensate the user for even an ongoing breach of the contract, let alone compensate a user for any non-contractual claims.

103.    The limited recoverable damages are not the result of an effort to estimate a fair average compensation for any loss by Google Ads users.

### Likewise, the Arbitration Provision in the Contract Is Unenforceable Due to Its Unconscionability

104.    For similar and related reasons, the arbitration provision in the Advertising Program Terms is unconscionable and unenforceable.

105.     Whether an arbitration clause is unconscionable under California law requires a showing of both procedural and substantive unconscionability.

106.    "Unconscionability analysis begins with an inquiry into whether the contract is one of adhesion." *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 113 (2000); *accord Heckman v. Live Nation Ent., Inc.*, 120 F.4th 670, 681 (9th Cir. 2024).

107.    There is no question that the Advertising Program Terms are procedurally unconscionable. *See* ¶¶90-91, *supra*; *see also Heckman,* 120 F.4th at 682 ("The elements of oppression and surprise are satisfied by a finding that the arbitration provision was presented on a take-it-or-leave-it basis and that it was oppressive due to an inequality of bargaining power that result[ed] in no real negotiation and an absence of meaningful choice.") (cleaned up).

108.    "When there is substantial procedural unconscionability even a relatively low degree of substantive unconscionability may suffice to render the agreement unenforceable." *Heckman*, 120 F.4th at 683 (cleaned up).

109.    The arbitration is also procedurally unconscionable, at least in part, due to the inclusion of the unconscionable Damages Limitation provision. *See* ¶¶87-102, *supra*.

110.    Although the Damages Limitation provision is not included within the arbitration agreement in the Advertising Program Terms, it is an inherent part of the arbitration provisions because it severely and improperly seeks to limit the damages recoverable only by program users and not Google.

111.    In fact, the Damages Limitation effectively renders the arbitration provision illusory because there is no incentive for users to engage in arbitration that nearly eliminates its remedies.

112.    Finding legal representations under those terms would be nearly impossible.

113.    As one court has found in a case with similar damages limitations in an arbitration agreement, "[the arbitration] guaranteed that plaintiffs could not possibly obtain anything approaching full recompense for their harm by limiting any recovery they could obtain to the amount they paid [the defendant] for their trip. In addition to a limit on their recovery, plaintiffs, residents of Colorado, were required to mediate and arbitrate in San Francisco – all but guaranteeing both that [the defendant] would never be out more than the amount plaintiffs had paid for their trip, and that any recovery plaintiffs might obtain would be devoured by the expense they incur in pursing their remedy." *Lhotka*, 181 Cal. App. 4th at 825 (cleaned up).

114.    Here, too, because the Damages Limitation applies solely to Google Ads users, the arbitration provision, paraphrasing *Lhotka*, all but guarantees both that Google would never be out more than the amount a plaintiff has paid for the last 30 days of costs Google charges, and that any recovery a plaintiff might obtain would be devoured by the expense they incur in pursing their remedy.

115.    Moreover, in light of Google's attempt to force its advertising customers into arbitration, the undersigned counsel brings this action simultaneously with individual arbitration

claims in the event that this Court finds such provisions unenforceable or Google agrees to waive such provisions as to the instant class.

### PLAINTIFF'S ALLEGATIONS

116.    Plaintiff PVC Fence Wholesale, LLC is a Florida limited liability company that is engaged in selling PVC fencing and other fencing materials to retailers, contractors, and consumers.

117.    Plaintiff is a Google Ads advertiser.

118.    The contract between the parties is defined by both the Google Ads Programming Terms (Exhibit A) and Defendant's representations concerning the Google Ads service that it provides throughout various related websites.

119.    Defendant has routinely charged Plaintiff for placing Plaintiff's advertising in response to "other search terms" that neither fall within Plaintiff's selected terms nor are identified by Defendant.

120.    From 2020 to 2025, Plaintiff paid Defendant approximately $49,452.90 for Google Ads, of which $18,336.56 (*i.e., 38%*) was for undisclosed ("other") search terms:[21]

| Year | Total Amount Charged By Google | Total Amount Google Charged for Disclosed Search Terms | Total Amount Google Charged for Undisclosed ("Other") Search Terms | % of Undisclosed ("Other") Search Terms |
|---|---|---|---|---|
| 2025 | $2132.5 | $1223.31 | $907.8 | 43% |
| 2024 | $6371.76 | $3744.64 | $2624.61 | 41% |
| 2023 | $9651.51 | $5427.57 | $3957.29 | 41% |
| 2022 | $9770.58 | $5344.8 | $3978.12 | 41% |
| 2021 | $10520.95 | $6581.15 | $3406.22 | 32% |
| 2020 | $11005.6 | $7125.06 | $3462.52 | 31% |
| **Total/Avg** | $49,452.90 | $29,446.53 | $18,336.56 | 38% |

[21]    Attached hereto as Exhibit B are screen shots of Plaintiff's SQRs for the time period of 2020-2025 from which the numbers in this chart are derived, including Defendant's charges for so-called "other search terms.

121.    Throughout this time period, the number of Plaintiff's ads placed by Defendant allocated to "other search terms" has averaged **38%** of all ads placed.

122.    Because of Defendant's policies and practices, Plaintiff has been injured and damaged by, *inter alia*, being charged for key words it did not choose, paying and being charged for key words that Google never ran, Google manipulating its pricing structure to charge an effectively higher-than-disclosed price for key words, and by precluding Plaintiff from being able to take any action to modify and improve its search terms to avoid these triggers through negative search terms.

## CLASS ACTION ALLEGATIONS

123.    Plaintiff brings this case as a class action pursuant to Rule 23(b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure, on its own behalf and as Class representative on behalf of the following:

> All persons and entities nationwide who used Google Ads to place advertisements and who have been charged by Defendant for advertisements categorized and displayed in SQRs as "Other Search Terms" (the "Class" or "Class Members").

124.    Plaintiff reserves the right to amend the Class definition if further investigation and discovery indicate that the Class definition should be narrowed, expanded, or otherwise modified.

125.    Excluded from the Class are: (a) any Judge or Magistrate presiding over this action and members of their families; (b) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parent(s) have a controlling interest and its current or former employees, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Class; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) Plaintiff's counsel and Defendant's counsel; and (f) the legal representatives, successors, and assigns of any such excluded persons

126.    This action has been brought and may be maintained as a class action under the Federal Rules of Civil Procedure.

**Numerosity**

127.    Federal Rule of Civil Procedure 23(a)(1). This Class numbers over one million businesses that use Google Ads. StatsUp, *Google Ads Statistics* (Jan. 3, 2025),

1  https://analyzify.com/statsup/google-ads. As a result, joinder of all Class Members in a single

2  action is impracticable. Class Members may be informed of the pendency of this class action

3  through a variety of means, including, but not limited to, direct mail, email, published notice, and

4  website posting.

5  **Existence and Predominance of Common Questions of Law and Fact**

6       128.   <u>Federal Rules of Civil Procedure 23(a)(2) and (b)(3)</u>. There are questions of fact

7  and law common to the Class that predominate over any questions affecting only individual

8  members. Those questions, each of which may also be certified under Rule 23(c)(4), include, but

9  are not limited to:

10              (a)    whether Defendant charged Plaintiff and the Class for advertising that

11  Defendant categorized as "other search terms";

12              (b)    whether Defendant disclosed to Plaintiff and the Class any of the search

13  terms that resulted in charges that Defendant allocates to the category "other search terms";

14              (c)    whether Defendant provided Plaintiff and the Class any information about

15  search terms and key words that triggered charges for "other search terms";

16              (d)    whether Defendant could provide and display the search terms, number of

17  impressions, number of interactions, interaction rate, and average cost for search terms that

18  Defendant claims resulted in a click and are included in "other search terms";

19              (e)    whether Defendant makes available for any search terms for which it

20  charges any personally identifiable information about the persons or entities who entered the

21  respective search terms and clicked on Google Ads that resulted in charges to Plaintiff and the

22  Class;

23              (f)    whether Defendant breached its contract with Class Members by failing to

24  provide SQRs that allow businesses, such as those of Plaintiff and the Class, to: (i) assess which

25  search terms and which parameters are triggering successful ad placements with valuable

26  conversions; (ii) determine which search terms are not successful; and (iii) refine their search

27  parameters by identifying negative search terms;

28

1          (g)      whether Defendant has breached and continues to breach its contractual

2  obligations by failing and refusing to provide Plaintiff and other Class Members with the detail

3  required for them to determine which ads designated "other search terms" are inconsistent with or

4  unrelated to Plaintiff's or Class Members' selected search terms and parameters;

5          (h)      whether Defendant has breached and continues to breach its contractual

6  obligations by failing and refusing to provide Plaintiff and other Class Members with the detail

7  required for them to determine which ads designated "other search terms" contain terms that, if

8  disclosed, would afford Plaintiff or each member of the Class the ability to add to their "negative

9  search terms" list;

10         (i)      whether Defendant has unfairly interfered, and continues to interfere, with

11  Plaintiff's and Class Members' rights to receive the benefits of their contract in violation of the

12  covenant of good faith and fair dealing by placing Plaintiff's and Class Members' ads in response

13  to search terms that are not consistent with those they designated and concealing whether Plaintiff

14  and Class Members are being charged when their ads are placed in response to search terms that

15  are unrelated to its selected search terms and parameters;

16         (j)      whether Defendant has unfairly interfered, and continues to interfere, with

17  Plaintiff's and Class Members' rights to receive the benefits of their contract in violation of the

18  covenant of good faith and fair dealing by failing and refusing to provide Plaintiff and Class

19  Members with the detail required for them to: (i) determine which ads falling under "other search

20  terms" are inconsistent with or unrelated to their selected search terms and parameters; (ii) identify

21  successful search terms to add to their designated search terms; and (iii) identify terms that, if

22  disclosed, would afford Plaintiff and Class Members the ability to add to their respective "negative

23  search terms" lists;

24         (k)      whether, in the alternative to breaching its contract with Plaintiff and Class

25  Members, Defendant has been unjustly enriched and is liable under a theory of quasi-contract

26  because it has received and retained payments for the ads supposedly triggered by "other search

27  terms" although it fails and refuses to provide Plaintiff and Class Members with the data necessary

28  for them to determine whether they have been charged when their ads are placed in response to

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL – Case No.                            - 31 -

search terms that are unrelated to their selected search terms and parameters, refine their search terms, parameters, and create negative search terms to avoid triggering payments to Defendant for valueless ad placements;

(l)     whether, under the principles of equity and good conscience, Defendant should be permitted to retain money belonging to Plaintiff and Class Members when Defendant refuses to provide the data necessary to determine the validity of the charges and/or to permit Plaintiff and Class Members with the ability to refine their keywords and search parameters to minimize the placement of non-revenue-generating ads;

(m)     whether Defendant engaged in a common course of conduct to defraud Plaintiff and Class Members into believing that they would only be charged for advertisements placed consistent with Plaintiff's and Class Members' selected keywords and search parameters;

(n)     whether Defendant engaged in a common course of conduct to defraud Plaintiff and Class Members into believing that Defendant would provide them with data that would enable them to: (i) refine their keyword search terms; (ii) refine their search parameters; and (iii) refine their excluded terms, all in order to maximize the value of their advertising dollars spent on Google Ads;

(o)     whether, as a common course of conduct, Defendant intentionally concealed, and continues to conceal, from Plaintiff and Class Members that it charges them for ads in response to internet searches that are not within their search terms and parameters and that it will not, in fact, provide them with the data necessary to both identify misplaced ads and refine their search terms and parameters;

(p)     whether Defendant has violated California's Consumers Legal Remedies Act ("CLRA") by falsely representing that it provides Plaintiff and Class Members with SQRs that will allow them to refine their search terms and parameters to avoid waste of their advertising dollars;

(q)     whether Defendant has violated the CLRA because it places Plaintiff's and Class Members' ads in response to search terms that are not within the search terms and parameters selected by the users;

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL – Case No.                    - 32

(r)    whether Defendant has violated the CLRA because it advertises and sells the Google Ads service as providing characteristics, qualities, and benefits, such as the accuracy of the placements and the ability to access data to refine searches and parameters, knowing that it will not do so and that it masks data that results in Defendant's collection of sums from Plaintiff and Class Members that are of no benefit to them;

(s)    whether Defendant has violated the CLRA because it rejects efforts by Plaintiff and Class Members to access hidden data that would allow them to maximize their advertising revenue;

(t)    whether Defendant has violated the CLRA because it includes unconscionable terms in its contract such as the purported limitation of liability;

(u)    whether the purported limitation of liability in the parties' contracts is procedurally and substantively unconscionable;

(v)    whether Defendant has violated California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §17500, *et seq.*, because Defendant has made, and continues to make, false statements of fact in its commercial advertisements concerning the Google Ads service that it offers;

(w)    whether Defendant's actions in connection with its Google Ads have violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §17200, *et seq.*, which prohibits unfair competition, including unlawful, unfair, and fraudulent business acts;

(x)    whether the impropriety of Defendant's actions and inactions are exacerbated by the fact that Google Ads, and Defendant's business in general, is an adjudicated monopoly, depriving its users such as Plaintiff and Class Members from alternatives that could provide the same advertising services;

(y)    whether the provision entitled, "Limitation of Liability" at paragraph 10 in the Program Terms (Exhibit A) is unenforceable because it is procedurally and substantively unconscionable;

(z)    whether the arbitration agreement contained in the Advertising Program Terms is unenforceable because it is both procedurally and substantively unconscionable;

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL – Case No.

(aa)     whether the class action waiver contained in the Advertising Program Terms is unenforceable because it is both procedurally and substantively unconscionable; and

(bb)     whether Plaintiff and the Class are entitled to damages and equitable relief.

**Typicality**

129.     Federal Rule of Civil Procedure 23(a)(3). Plaintiff's claims are typical of those of the Class because Plaintiff, like every other Class Member, is a consumer who utilized Google Ads service under identical contractual terms and representations by Defendant and who was charged for ads placed in the so-called "other search terms" in SQRs, the details of which Defendant has not provided and refused to provide despite representations that it would do so.

**Superiority**

130.     Federal Rule of Civil Procedure 23(b)(3). A class action is the appropriate method for the fair and efficient adjudication of this controversy. The presentation of separate actions by individual Class Members could create a risk of inconsistent adjudications, establish incompatible standards of conduct for Defendant, and/or substantially impair or impede the ability of Class Members to protect their interests. In addition, it would be impracticable and undesirable for each member of the Class who suffered an economic loss to bring a separate action. The maintenance of separate actions would place a substantial and unnecessary burden on the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of all Class Members.

**Adequacy**

131.     Federal Rule of Civil Procedure 23(a)(4). Plaintiff is an adequate representative of the Class because it is a member of the Class and its interests do not conflict with the interests of the Class that it seeks to represent. The interests of the members of the Class will be fairly and adequately protected by Plaintiff and its undersigned counsel.

**Declaratory and Injunctive Relief**

132.     Federal Rule of Civil Procedure 23(b)(2). Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Class, thereby making

1  appropriate final injunctive relief and declaratory relief, as described below, with respect to the

2  members of the Class as a whole.

3      133.   Additionally, the prosecution of separate actions by individual members of the

4  Class would create a risk of inconsistent or varying adjudications with respect to individual

5  members of the Class that would establish incompatible standards of conduct for Defendant; the

6  prosecution of separate actions by individual members of the Class would create a risk of

7  adjudications with respect to them which would, as a practical matter, be dispositive of the interests

8  of other members of the Class not parties to the adjudications, or substantially impair or impede

9  their ability to protect their interests; and/or Defendant has acted or refused to act on grounds

10 generally applicable to the Class, thereby making appropriate final and injunctive relief with

11 respect to the members of the Class as a whole.

12     134.   Plaintiff and the Class reserve the right to seek in the alternative, certification of

13 issues pursuant to Fed. R. Civ. P. 23(c)(4).

14                              **COUNT I**

15                       **BREACH OF CONTRACT**

16     135.   Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1-134, above, and

17 further alleges as follows:

18     136.   As discussed above, Defendant informs businesses that they can establish the

19 search parameters that they wish to utilize to trigger the placement of their advertisements

20 including the similarity to the selected terms that may trigger an ad placement.

21     137.   Defendant commits to place advertisements solely in compliance with the

22 businesses' selected terms and parameters.

23     138.   Defendant also commits to providing businesses with access to SQRs that allow

24 businesses to: (a) assess which search terms and which parameters are triggering successful ad

25 placements with valuable conversions; (b) determine which search terms are not successful; and

26 (c) refine their search parameters by identifying negative search terms.

27     139.   However, Defendant's SQRs to Plaintiff reveal that an average of 38% of Plaintiff's

28 ads were placed in response to undisclosed "other search terms." Defendant acts in an identical

1  manner with respect to other Class Members, charging them substantial sums for "other search

2  terms" without any disclosure.

3       140.   Defendant has breached, and continues to breach, these contractual obligations by:

4  (a) placing Plaintiff's and Class Members' ads in response to search terms that are not consistent

5  with those designated by Plaintiff and Class Members; and (b) failing and refusing to provide

6  Plaintiff and Class Members with the detail required for them to determine which ads falling under

7  "other search terms": (i) are inconsistent with Plaintiff's and Class Members' selected search terms

8  and parameters; (ii) identify successful search terms to add to their designated search terms; (iii)

9  identify terms that, if disclosed, would afford Plaintiff and Class Members the ability to add to

10 their "negative search terms" list; and (iv) determine if Plaintiff and Class Members are being

11 charged when its ads are placed in response to search terms that are unrelated to its selected search

12 terms and parameters.

13      141.   Defendant's breaches through its failure and refusal to disclose the "other search

14 terms" results in Defendant's charging Plaintiff and Class Members for millions, if not billions, of

15 dollars for advertising that may, or may not, be responsive to its search terms and parameters, that

16 Defendant may or may not have ever placed, which Defendant fails and refuses to provide detail

17 so that Plaintiff and Class Members can avoid incurring these useless ghost charges, all to

18 Defendant's benefit and Plaintiff's and Class Members' financial detriment, and which allow

19 Defendant to effectively inflate the charges of the key words for which Defendant does provide

20 reporting information.

21      142.   As a result of these breaches, Plaintiff and Class Members have suffered damages.

22                                    **COUNT II**

23            **BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**

24      143.   Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1-134 above, and

25 further alleges as follows.

26      144.   Plaintiff and Defendant contracted for Defendant to place its advertisements in a

27 response to user internet searches based on search terms and search parameters selected by

28 Plaintiff. Class Members similarly contracted with Defendant.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL – Case No.                    - 36 -

145.    Defendant contracts with Plaintiff and Class Members that its algorithms will result in the placement of ads in a manner consistent with Plaintiff's and Class Members' selected search terms and parameters.

146.    Every contract contains an implied covenant of good faith and fair dealing that supplements the express contractual covenants to prevent a contracting party from engaging in conduct which, while not technically transgressing the express covenants, frustrates the other party's rights.

147.    This covenant also requires each party to do everything the contract presupposes the party will do to accomplish the agreement's purposes.

148.    Defendant agreed to provide Plaintiff and Class Members access to data that would allow Plaintiff and Class Members to refine their search terms and parameters by providing data that would allow Plaintiff and Class Members to determine which search terms and parameters were successful and which search terms and parameters would benefit from modification and/or be identified as "negative search terms" and also would allow Plaintiff and Class Members to determine if their ads charged are placed in response to search terms that are unrelated to their selected search terms and parameters.

149.    Plaintiff and Class Members have performed all their obligations under the contract in that Plaintiff and Class Members paid Defendant for all advertising placed by Defendant, ostensibly consistent with Plaintiff's and Class Members' selected search terms and parameters.

150.    All conditions precedent to Defendant's performance of its obligations occurred.

151.    As discussed above, under the search parameters of "broad match," "phrase match," or "exact match," terms that are considered similar or related to those terms may trigger ad placements depending on the category selected.

152.    Regarding the search parameters, when placement is triggered by a so-called "close variant" or "broad match," those terms are selected by Defendant at its (or its AI's) discretion.

153.    Defendant is required to exercise its discretion in good faith and not in a manner that will benefit Defendant to Plaintiff's and Class Members' detriment.

154.    Defendant has unfairly interfered, and continues to interfere, with Plaintiff's and Class Members' rights to receive the benefits of their contract by: (a) placing Plaintiff's and Class Members' ads in response to search terms that are not consistent with those designated by Plaintiff and Class Members; (b) failing and refusing to provide Plaintiff and Class Members with the detail required for Plaintiff and Class Members to determine which ads falling under "other search terms": (i) are inconsistent with Plaintiff's and Class Members' selected search terms and parameters; (ii) identify successful search terms to add to their designated search terms; and (iii) identify terms that, if disclosed, would afford Plaintiff and Class Members the ability to add to their "negative search terms" list; and (c) concealing whether Plaintiff and Class Members are being charged when their ads are placed in response to search terms that are unrelated to their selected search terms and parameters.

155.    Defendant's breaches through its failure and refusal to disclose the "other search terms" results in Defendant charging Plaintiff and Class Members for millions, if not billions, of dollars for advertising that may, or may not, be responsive to their search terms and parameters, that Defendant may or may not have ever placed, which Defendant fails and refuses to provide detail so that Plaintiff and Class Members can avoid incurring these useless ghost charges, all to Defendant's benefit and Plaintiff's and Class Members' financial detriment, and which allow Defendant to effectively inflate the charges of the key words for which Defendant does provide reporting information.

156.    As a result of these breaches, Plaintiff and Class Members have suffered damages.

157.    As a result of Defendant's failure to perform its contractual obligations in good faith, and by exercising its discretion in bad faith, Plaintiff and Class Members have been damaged in an amount to be established herein.

## COUNT III

## QUASI-CONTRACT FOR RESTITUTION AND DISGORGEMENT

158.    Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1-134 above, and further alleges as follows:

159.    This claim is alleged in the alternative to Plaintiff's claims for breach of contract and breach of the implied covenant of good faith and fair dealing.

160.    Defendant has induced and enticed Plaintiff and the Class through Defendant's "other search terms" scheme to pay Defendant money for advertising about which Defendant fails to provide any information or data that would allow Plaintiff and the Class to determine if Defendant charged them for the advertising they requested, to change their advertising plan to exclude or negative search terms that result in unwanted charges, or if Defendant provided them with any advertising at all. Defendant induced and enticed Plaintiff and the Class by, *inter alia*, promising to provide them with data and information about charges for Google Ads and then failing to do so.

161.    To the extent that Defendant claims that, despite multiple and repeated representations concerning the scope of the Google Ads services, it was not contractually obligated to both: (a) place Plaintiff's and Class Members' ads consistent with their search terms and parameters; and (b) provide Plaintiff and Class Members with complete data concerning: (i) which user search requests had triggered placement of their ads; (ii) which ads placed in response to specific user search requests had not resulted in conversions; and (iii) which terms were triggering unsuccessful ad placements suggesting that the terms should be added to Plaintiff's and Class Members' negative search terms, it repeatedly has represented that it would do so.

162.    Defendant has charged and retained payments from Plaintiff and Class Members for placement of ads that should not have been placed in response to Plaintiff's and Class Members' search terms and parameters and/or should have been identified to Plaintiff and Class Members in order to allow them to refine its search terms, parameters, and negative search terms and/or are placed in response to search terms that are unrelated to its selected search terms and parameters.

163.    Defendant has retained Plaintiff's and Class Members' payments but, rather than provide Plaintiff and Class Members with the data necessary to either confirm that the ads were placed properly by Defendant or that the placements were triggered by searches that should be

1  refined, has simply lumped, for example, 38% of Plaintiff's ads as having been placed based on

2  unidentified "other search terms."

3      164.    Defendant has received and retained payments for the ads supposedly triggered by

4  "other search terms" although it fails and refuses to provide Plaintiff and Class Members with the

5  data necessary for them to be able to determine whether they have been charged when its ads are

6  placed in response to search terms that are unrelated to their selected search terms and parameters,

7  refine their search terms, parameters, and negative search terms to avoid triggering payments to

8  Defendant for valueless ad placements.

9      165.    If there is no remedy for breach of contract, then Plaintiff and Class Members may

10  be left without a remedy at law.

11      166.    Defendant's conduct through its failure and refusal to disclose the "other search

12  terms" results in Defendant's charging Plaintiff and Class Members for millions, if not billons, of

13  dollars for advertising that may, or may not, be responsive to their search terms and parameters,

14  that Defendant may or may not have ever placed, which Defendant fails and refuses to provide

15  detail so that Plaintiff and Class Members can avoid incurring these useless ghost charges, all to

16  Defendant's benefit and Plaintiff's and Class Members' financial detriment, and which allow

17  Defendant to effectively inflate the charges of the key words for which Defendant does provide

18  reporting information.

19      167.    As a result of such conduct, Plaintiff and Class Members are entitled to restitution

20  and disgorgement under a theory of quasi-contract in the precise and definite sum of their payments

21  to Defendant for "other search terms," plus interest.

22  **COUNT IV**

23  **VIOLATION OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT**

24      168.    Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1-134, above, and

25  further alleges as follows:

26      169.    California's CLRA prohibits "unfair methods of competition and unfair or

27  deceptive acts or practices" when "undertaken by any person in a transaction intended to result or

28  that results in the sale or lease of goods or services to any consumer[.]" Cal. Civ. Code §1770(a).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL – Case No.                    - 40

170. The proscribed acts and practices include:

- [r]epresenting that goods or services have . . . characteristics, . . . uses, [or] benefits . . . that they do not have (Cal. Civ. Code §1770(a)(5));

- [r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another (Cal. Civ. Code §1770(a)(7));

- [a]dvertising goods or services with intent not to sell them as advertised (Cal. Civ. Code §1770(a)(9)); and

- [i]nserting an unconscionable provision in the contract (Cal. Civ. Code §1770(a)(19)).

171. Defendant has violated the CLRA because it:

- falsely represents that it provides Google Ads users such as Plaintiff and Class Members with SQRs that will allow users to refine their search terms and parameters to avoid waste of their advertising dollars;

- places Google Ads users' ads, such as those of Plaintiff's and Class Members', in response to search terms that are not within the search terms and parameters selected by the users;

- advertises and sells the Google Ads service as providing characteristics, qualities, and benefits, such as the accuracy of the placements and the ability to access data to refine searches and parameters, knowing that it will not do so, and that it masks data that results in Defendant's collection of sums from users such as Plaintiff and Class Members that are of no benefit to the users;

- rejects efforts by Google Ads users such as Plaintiff and Class Members to access hidden data that would allow them to maximize their advertising revenue; and

- includes unconscionable terms in its contract such as the purported limitation of liability, the arbitration agreement, and the class action waiver.

172.    Regarding Defendant's representations concerning the characteristics, uses, benefits, standard, and quality of Google Ads, Plaintiff and Class Members relied on those representations when they chose to use Google Ads to market their products and services.

173.    A private civil action under the CLRA affords a consumer who suffers "any damage" to bring an action against the person who violated the CLRA. Cal. Civ. Code §1780(a).

174.    Plaintiff served pre-suit notice on Defendant in compliance with Cal. Civ. Code §1782, a copy of which is attached hereto as Exhibit C.

175.    At this time, Plaintiff seeks declaratory and injunctive relief providing that: (a) Defendant's failure to provide the necessary and promised data concerning the "other search terms" is unfair and deceptive practice; (b) Defendant's inclusion of unconscionable terms, including the limitation of liability in Google's Advertising Program Terms, is an unfair and deceptive practice; and (c) enjoining Defendant from refusing to provide the data concerning the "other search terms" provided that the source IP addresses of the searches may be withheld for privacy reasons.

176.    Pursuant to the provisions of the CLRA, upon expiration of the 30-day period in Cal. Civ. Code §1782(a)(1), Plaintiff will seek leave to amend this Complaint as provided in Cal. Civ. Code §1782(d) to seek actual damages, restitution, punitive damages, and any other relief that this Court deems proper, as well as Court costs and attorneys' fees. Cal. Civ. Code §1780(a), (e).

## COUNT V

### FALSE ADVERTISING UNDER CALIFORNIA'S FALSE ADVERTISING LAW, CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17500, *et seq.*

177.    Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1-134, above, and further alleges as follows:

178.    California's FAL makes it illegal for a person or business to use any means to make "any statement, concerning . . . [its] services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance . . . which is untrue or

1    misleading, and, which is known, or which by the exercise of reasonable care should be known, to

2    be untrue or misleading, or for any person, firm, or corporation to so make or disseminate or cause

3    to be so made or disseminated any such statement as part of a plan or scheme with the intent not

4    to sell . . . those services, professional or otherwise, so advertised at the price stated therein, or as

5    so advertised." Cal. Bus. & Prof. Code §17500, *et seq.*

6        179.    As discussed above, Defendant has made, and continues to make, false statements

7    of fact in its commercial advertisements concerning the Google Ads service that it offers.

8        180.    Defendant advertises that it places a Google Ads user's ad in response to the

9    specific search terms and parameters as set by the user, and that it does not trigger an ad's

10    placement if it includes any "negative search terms" as designated by the user.

11        181.    Defendant also advertises that Google Ads users have access to reports that will

12    allow the user to identify search terms and parameters that are successfully triggering conversions,

13    identify those not triggering conversions, focus on ad parameters that are successful, and identify

14    search terms that it should exclude because those terms are triggering ad placements by Defendant

15    that do not result in conversions or potential customers.

16        182.    Plaintiff and Class Members have been damaged because Defendant fails to

17    disclose what search terms are lumped into "other search terms" and does not provide the promised

18    data in the SQRs.

19        183.    Defendant's use of this catch-all category of "other search terms" allows Defendant

20    to conceal both: (a) whether the ads were placed consistently with Plaintiff's and Class Members'

21    search terms and parameters; and (b) which search terms are triggering these placements and

22    should be: (i) added to Plaintiff's and Class Members' search terms; or (ii) conversely, added to

23    Plaintiff's and Class Members' negative search words.

24        184.    Defendant places Plaintiff's and Class Members' ads and collects money for each

25    placement, all to Defendant's benefit, and to Plaintiff's and Class Members' detriment; Defendant

26    keeps Plaintiff's and Class Members' advertising dollars without repercussion.

27        185.    Yet, Plaintiff and Class Members have no alternative other than to use Defendant's

28    Google Ads due to Defendant's monopoly.

186.    Plaintiff has standing to assert a claim under the FAL because Plaintiff relied on Defendant's advertised representations concerning the functionality of Google Ads and Defendant's representations as to what data would be provided and that, with the data provided by Defendant, Plaintiff would be able to modify its search terms, search parameters, and negative key words to maximize the value of its advertising dollars by avoiding having its ads placed in response to non-productive search criteria.

187.    Accordingly, Plaintiff has suffered an injury in fact and has lost money as a result of Defendant's false advertising.

## COUNT VI

## VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, BUSINESS AND PROFESSIONS CODE SECTION 17200, *et seq.*

188.    Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1-134, above, and further alleges as follows:

189.    California's UCL "prohibits unfair competition, including unlawful, unfair, and fraudulent business acts. The UCL covers a wide range of conduct." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1143 (2003).

190.    Under the UCL, "a practice may be deemed unfair even if not specifically proscribed by some other law." *Id.*

191.    Practices prohibited by the UCL expressly include those prohibited by the FAL and CLRA, and those allegations are expressly incorporated herein by reference.

192.    The UCL's balancing test overwhelmingly weighs in favor of a finding that Defendant has engaged in unlawful, unfair, and fraudulent business acts. Defendant's justification for charging Plaintiff and the Class for advertising about which Defendant does not reveal any information or data under the guise that privacy concerns preclude Defendant from disclosing such information, is baseless. Defendant never provides any personally identifiable information about any persons or entities that click on Google Ads that result in charges to Plaintiff and the Class. Thus, Defendant's refusal to disclose the search terms that result in charges to Plaintiff and the Class on Defendant's so-called privacy grounds is without merit.

193.    Furthermore, Defendant has been held liable for antitrust, *i.e.*, anticompetitive, behavior for abusing its role as a monopolist in the General Search Text Ads Market, in violation of the Sherman Act, a clear example of unfair competition.

194.    Each of the counts set forth, *supra*, describes actions and inaction by Defendant that constitutes unfair competition, including unlawful and unfair business acts.

195.    The impropriety of Defendant's actions and inactions are exacerbated by the fact that Google Ads, and Defendant's business in general, is an adjudicated monopoly, depriving its users, such as Plaintiff and Class Members, from alternatives that could provide the same advertising services.

196.    Plaintiff and Class Members have suffered injury in fact and have lost money or property as a result of the unfair competition because Plaintiff and Class Members have been billed for the placement of their ads but Defendant has failed and refuses to provide the data that would allow Plaintiff and Class Members to identify ad placements that do not fall within their search terms and parameters or to modify and revise their search terms, parameters, and negative search terms in order to not squander their advertising budget on ads that should not have been triggered and/or search terms and parameters that do not result in sales.

197.    On behalf of itself and all other and Class Members, Plaintiff seeks, under the UCL both: (a) restitution; and (b) declaratory and injunctive relief: (i) providing that Defendant's failure to provide the necessary and promised data concerning the "other search terms" is unlawful and unfair business practice; (ii) providing that Defendant's inclusion of unconscionable terms, including the limitation of liability in Google's Advertising Program Terms, is an unfair and deceptive practice; and (iii) enjoining Defendant from refusing to provide the data concerning the "other search terms" provided that the source IP addresses of the searches may be withheld for privacy reasons.

## COUNT VII

## DECLARATORY JUDGMENT

198.    Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1-134 above as if fully set forth herein.

199.    Under the Declaratory Judgment Act, 28 U.S.C. §2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, this Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

200.    An actual controversy has arisen in the wake of Defendant's scheme of charging Plaintiff and the Class for advertising about which Defendant fails to provide any data or information regarding its present and prospective common law, statutory, and other duties to refrain from unfair and deceptive business practices.

201.    Plaintiff and the Class allege that Defendant's purported privacy justification for refusing to provide them with any data or information about the search terms for which Defendant charges Plaintiff and the Class money under the category of "other search terms" is baseless, and that because Defendant holds monopoly over search engines, Plaintiff and the Class Members will continue to suffer injury because they have no other search engine on which to effectively advertise.

202.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

- Defendant's limitation on liability in its terms of service is unenforceable as it is procedurally and substantively unconscionable in light of its terms and Defendant's unlawful conduct as alleged herein.

- Defendant's arbitration provision in its terms of service is unenforceable as it is procedurally and substantively unconscionable in light of its terms and Defendant's unlawful conduct as alleged herein.

- Defendant's class action waiver in its terms of service is unenforceable as it is procedurally and substantively unconscionable in light of its terms and Defendant's unlawful conduct as alleged herein, including, but not limited to, that: (a) the class action waiver is contained in a consumer contract of

adhesion, in which small amounts of damages are at issue; and (b) Google, a monopoly with the superior bargaining power, has carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money.

203.    If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury and lack an adequate legal remedy.

204.    The risk that Defendant will continue its unlawful practices is real, immediate, and substantial, and leaves Plaintiff and the Class without an adequate remedy at law because Defendant's purported limitation on liability, arbitration, and class action waiver effectively preclude Plaintiff and the Class from obtaining full compensation for Defendant's unlawful conduct, and leaves them without a mechanism to stop such unlawful conduct.

205.    Issuance of the requested injunction will not do a disservice to the public interest. To the contrary, such an injunction would benefit the public by preventing Defendant from deceiving advertisings on the search engine platform over which Defendant holds a monopoly.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, individually and on behalf of the other members of the Class alleged herein, respectfully requests that this Court enter judgment in its favor and against Defendant as follows:

A.    For an Order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as the representatives for the Class and Plaintiff's attorneys as Class Counsel;

B.    For an Order declaring Defendant's conduct violates the causes of action referenced herein;

C.    For an Order finding in favor of Plaintiff and the Class on all counts asserted herein;

D.    For compensatory, statutory, and punitive damages in amounts to be determined by this Court and/or jury;

E.    For restitution and disgorgement of all sums wrongfully obtained by Defendant;

F.    For prejudgment interest on all amounts awarded;

1    G.  For injunctive relief as pleaded or as this Court may deem proper;

2    H.  For an Order awarding Plaintiff and the Class their reasonable attorneys'
3        fees and expenses and costs of suit, and any other expense, including expert
         witness fees; and

4    I.  Such other and further relief as this Court deems just and proper.

5          **DEMAND FOR JURY TRIAL**

6   Plaintiff and Class Members demand a trial by jury of any and all claims in this Complaint

7 and of any and all issues in this action so triable.

8 DATED:  June 30, 2025     ROBBINS GELLER RUDMAN
                & DOWD LLP
9              SHAWN A. WILLIAMS

10

11               s/ Shawn A. Williams
                 Shawn A. Williams
12

13            Post Montgomery Center
            One Montgomery Street, Suite 1800
14           San Francisco, CA  94104
            Telephone:  415/288-4545
15           shawnw@rgrdlaw.com

16           ROBBINS GELLER RUDMAN
            & DOWD LLP
17           PAUL J. GELLER*
            STUART A. DAVIDSON*
18           MARK J. DEARMAN*
            225 NE Mizner Boulevard, Suite 720
19           Boca Raton, FL  33432
            Telephone:  561/750-3000
20           pgeller@rgrdlaw.com
            sdavidson@rgrdlaw.com
21           mdearman@rgrdlaw.com

22           WITES & ROGERS, P.A.
            MARC A. WITES*
23           MICHELE M. DESOER (SBN 119667)
            4400 North Federal Highway
24           Lighthouse Point, FL  33064
            Telephone:  954/933-4400
25           mwites@witeslaw.com
            mdesoer@witeslaw.com
26
           Attorneys for Plaintiff
27
           * *pro hac vice* application forthcoming
28

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL – Case No.    - 48 -